UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ASTOR MORRISON,

      Plaintiff,

   -against-

UNITED PARCEL SERVICE, INC.,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17cv2885

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

   Plaintiff Astor Morrison brings this employment discrimination action against United Parcel Service, Inc. ("UPS"). Morrison claims that UPS subjected him to a hostile work environment and disparate treatment on account of his race in violation of 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). UPS moves for summary judgment dismissing all claims. For the reasons that follow, UPS's motion is granted.

## BACKGROUND

I. Morrison's Employment and UPS's Anti-Discrimination Policies

   In November 2015, UPS hired Morrison as a journeyman mechanic and required him to complete a probationary training period before earning full-time employment and becoming a member of the union at the UPS worksite. (Pl.'s Counterstatement of Material Facts Pursuant to Local Rule 56.1, ECF No. 37 ("Pl.'s 56.1"), ¶¶ 16, 18.) During the probationary period, supervisors assess new mechanics on their proficiency in "certain diagnostics and repairs" and document their progress in weekly written evaluations. (Pl.'s 56.1, ¶¶ 20, 44.)

Morrison began his training during UPS's holiday delivery peak season. (Pl.'s 56.1, ¶¶ 19, 22.) Morrison, who is African-American, signed and acknowledged his understanding of UPS's anti-discrimination policies and the employee help line. (Pl.'s 56.1, ¶ 24; Affirmation of Heather Weine Brochin, Esq. in Support of Def.'s Motion for Summary Judgment, ECF No. 33 ("Brochin Affirm."), Ex. F at 7, 10.) UPS's Equal Opportunity Statement declares that "[UPS does] not discriminate against any . . . employee in any respect of his . . . employment . . . because of . . . race[.]" (Brochin Affirm., Ex. D.) UPS's Professional Conduct and Anti-Harassment Policy further provides that "[a]ny employee who . . . is subject to objectionable conduct must report it immediately to a supervisor or manager, a Human Resources representative . . . or the UPS Help Line . . . [and] UPS will conduct a prompt and thorough investigation." (Brochin Affirm., Ex E.)

II.  Morrison's Job Performance

After his first week of training, UPS assigned Morrison to a 9:30 p.m. to 6:00 a.m. shift at its Manhattan South facility. (Pl.'s 56.1, ¶ 26.) Morrison's supervisor was East Indian and three of his co-workers were white. (Pl.'s 56.1, ¶¶ 27, 28.) The other member of his crew, an East Indian man, was, like Morrison, a probationary hire. (Pl.'s 56.1, ¶ 28.)

UPS contends that Morrison's co-workers consistently complained about his "performance and attitude," while the facility's car washers griped that he was often late to return trucks from service maintenance. (Def.'s Statement of Material Facts Pursuant to Local Rule 56.1, ECF No. 32 ("Def.'s 56.1"), ¶¶ 34, 36; Affirmation of Eric Ragnauth, ECF No. 34 ("Ragnauth Affirm."), Ex. A.) His supervisor's weekly evaluations noted that Morrison routinely failed to "[meet] all expectations in the given criteria" and very often "need[ed] improvement." (Brochin Affirm., Ex. F.) Morrison "need[ed] to work at a faster pace with a

sense of urgency," "[had] become a little hostile towards his co-workers," and was "having difficulty with the simplest task like [an] oil change [and had] been blaming his co-worker[s]." (Ragnauth Affirm., Ex. A.) In a December 30, 2015 memorandum, Morrison's supervisor recommended Morrison's termination and noted that Morrison "[lacked] the skills and knowledge he claim[ed] to have as an auto mechanic" and "[could not] get along with his colleagues." (Ragnauth Affirm., Ex. A.)

Morrison paints a different picture of his brief tenure with UPS. He asserts that complaints about his performance were hardly ever brought to his attention. (Pl.'s 56.1, ¶ 36.) But that claim is belied by his signature on a number of his weekly evaluations pointing out his deficiencies. (Brochin Affirm., Ex. F.) Instead of rebutting his supervisor's specific observations, Morrison broadly asserts that there were "numerous cases" where he was "able to more efficiently and appropriately diagnose issues with UPS'[s] trucks than his Caucasian and East Indian colleagues." (Pl.'s 56.1, ¶ 35.) He offers no specificity or corroboration for this generalized assertion and the undisputed material facts show that Morrison was unable to perform a routine oil change, properly tighten a mirror, or move vehicles through the service line. (Ragnauth Affirm., Ex. B.) Finally, Morrison asserts that he complained on one occasion that "[his supervisor] was wrong [about] everything," but such a complaint says nothing about race discrimination. (Pl.'s 56.1, ¶ 38; Declaration of Gabrielle M. Vinci, Esq. in Opposition to Def.'s Motion for Summary Judgment, ECF No. 36 ("Vinci Decl."), Ex. 2 ("Herbert Dep."), at 24:15–25:8.)

III.    UPS's Alleged Hostile Work Environment

Morrison recounts several incidents during his time at Manhattan South that comprise his hostile work environment and disparate treatment claims.

3

First, on one occasion, Morrison's supervisor asked him to teach an emissions training course to the other mechanics. Because of his experience in the field, Morrison departed from the UPS training manual, prompting his supervisor to chastise him during the presentation and to remove him as the instructor. (Vinci Decl., Ex. 3 ("Morrison Dep."), at 120:19–123:12; Complaint, ECF No. 10 ("Compl.") ¶¶ 32–33.) Morrison "found [his supervisor's behavior] to be very offensive . . . he was trying to embarrass me [and] prove me wrong." (Morrison Dep., at 131:24–132:9.) Morrison did not report this incident to anyone else at UPS. (Pl.'s 56.1, ¶ 72.)

Second, Morrison's supervisor allegedly called him a "byword" during a meeting, a word which Morrison claims to be a derogatory racial slur. (Pl.'s 56.1, ¶ 73.) Morrison did not confront his supervisor and did not report the incident to anyone else at UPS. (Pl.'s 56.1, ¶ 74.)

Third, Morrison claims that Manhattan South personnel treated him differently from his fellow probationary mechanic. Aside from assigning easier tasks to the East Indian trainee, Morrison's supervisor purportedly credited that trainee for Morrison's work, and never complimented Morrison. (Pl.'s 56.1, ¶¶ 31, 79; Morrison Dep., at 133:2–135:19.) Morrison also asserts that one of his white co-workers berated him for returning a truck late, but did not reprimand his East Indian co-worker for a similar infraction. (Pl.'s 56.1, ¶ 79.)

Fourth, the same white mechanic made racially insensitive remarks to Morrison on two occasions. First, while castigating Morrison for an oil leak, the mechanic used a racial epithet. (Pl.'s 56.1, ¶ 75.) Second, after receiving a bottle of vodka as a holiday gift, the mechanic told Morrison that he was "going to make some jungle juice." (Pl.'s 56.1, ¶ 77.) Morrison did not report the oil leak incident or the "jungle juice" remark to any supervisor at the time. (Pl.'s 56.1, ¶¶ 76, 78.)

IV.  Morrison's Termination

At the end of the holiday season, the same UPS managers who hired Morrison decided not to retain him as a full-time employee. (Affirmation of Andrei Levchik, ECF No. 35, ¶¶ 9–10.) During a termination meeting on January 10, 2016, Morrison's hiring manager told him about his supervisor and co-workers' complaints. (Pl.'s 56.1, ¶ 63; Morrison Dep., at 179:20–181:12.) Morrison claims that he was not informed that his termination was performance-based. (Morrison Dep., at 181:22–182:4.) The parties dispute whether Morrison commented on the workplace dynamic during his termination meeting. UPS asserts that Morrison did not attribute his firing to any racial motivation, while Morrison avers that he told the hiring manager that his termination was biased and that his white co-worker had "racially attacked" him. (Def.'s 56.1, ¶ 65; Pl.'s 56.1, ¶ 65.) UPS subsequently filled Morrison's position with a man of Trinidadian-Indian descent. (Pl.'s 56.1, ¶ 63; Herbert Dep., at 34:4–20.)

## LEGAL STANDARD

Summary judgment is proper only when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to demonstrate "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Scott v. Harris, 550 U.S. 372, 380 (2007) (citation omitted). Therefore, when considering a motion for summary judgment, the court will "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

After the moving party has made its initial showing that there is no triable material issue of fact, the burden shifts to the plaintiff to "set out specific facts showing a genuine issue for trial" without relying merely on allegations or denials in the pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Therefore, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . [and to] create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2009). "[S]elf-serving, conclusory affidavits, standing alone are [also] insufficient. . . ." Russell v. Cty. of Rockland, 2017 WL 3189873, at *3 (S.D.N.Y. July 26, 2017) (citation omitted).

## DISCUSSION

I. Section 1981 and NYSHRL Claims

This Court analyzes § 1981 and NYSHRL claims together because they require the same standard of proof. Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015); Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014).

A. Hostile Work Environment

A hostile work environment claim is a mixed question of law and fact, so summary judgment will only be appropriate where "application of the law to those facts will reasonably support only one ultimate conclusion." Richardson v. N.Y. Dep't of Corr. Serv., 180 F.3d 426, 438 (2d Cir. 1999).

Section 1981 and the NYSHRL require the same analysis applied to Title VII

6

discrimination claims.  Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113 (2d Cir. 2015).  "[T]he standard for establishing a hostile work environment is high."  Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003).  A plaintiff opposing summary judgment on a hostile work environment claim must "produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Rivera, 743 F.3d at 20.  The conduct must be both "objectively severe or pervasive . . . [to] a reasonable person," as well as "subjectively . . . hostile or abusive [to the plaintiff]."  Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).  The plaintiff must further demonstrate that the hostile environment stems from "membership in a protected category."  Bliss v. MXK Rest. Corp., 220 F. Supp. 3d 419, 423 (S.D.N.Y. 2016) (citing Patane, 508 F.3d at 113).

Courts consider the totality of the circumstances when evaluating a hostile work environment claim.  Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 76 (2d Cir. 2016); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000).  The plaintiff must show "that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quotation marks omitted).  Relevant considerations include "(1) the frequency of the conduct, (2) its severity, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with an employee's work performance."  Boyd v. Presbyterian Hosp. in N.Y., 160 F. Supp. 2d 522, 540 (S.D.N.Y. 2001) (citation omitted).  One or two isolated uses of racially insensitive language are rarely sufficient, but rather, the plaintiff must demonstrate a "steady barrage of opprobrious racial comments."  Tolbert, 790 F.3d at 439 (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110

7

(2d Cir. 1997)). While "facially neutral comments may [further] contribute to the hostility of an employee's work environment . . . general allegations that African-Americans are treated differently in the workplace . . . are insufficient." Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) (internal citation omitted).

An individual alleging a hostile work environment must then also impute the objectionable behavior to his employer. Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 63 (2d Cir. 1992). When the harassment comes from an immediate supervisor, the employer will be presumed liable. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir. 1998). The standard is higher where the harassment instead comes from a co-worker. Russell, WL 3189873, at *4. Under § 1981, "[a]n employer will be liable [for a co-worker's harassment] if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment and did nothing about it." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106–07 (2d Cir. 2011) (quotation marks omitted) (emphasis added). And under the NYSHRL, an employer is only liable for conduct that was "encouraged, condoned, or expressly or impliedly approved." Marchuk v. Faruqi & Faruqi, LLP, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015).

Even drawing all inferences in Morrison's favor, he does not establish a pattern of behavior meeting § 1981 and the NYSHRL's demanding standard. In total, Morrison faced three isolated incidents with purportedly racial overtones: (1) his supervisor's referring to him as a "byword"; (2) his co-worker's use of a racial epithet; and (3) the same co-worker's "jungle juice" remark. "[T]here is [no] threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law." Richardson, 180 F.3d at 439. However, courts in the Second Circuit require a more pervasive and relentless pattern of behavior. See, e.g., Rivera,

8

743 F.3d at 21 (concluding district court erred in granting summary judgment for defendant where co-workers repeatedly taunted plaintiff with racial epithets, made "ethnically and racially hostile comments" outside of his presence, and subjected him to extensive bullying and physical harassment); see also Richmond v. Gen. Nutrition Ctrs., Inc., 2011 WL 2493527, at *15–16 (S.D.N.Y. June 22, 2011) (finding triable issue of fact where employer would not allow plaintiff to speak to customers because of his accent, told plaintiff that black employees were not good workers, and fabricated infractions so that plaintiff would be denied a wage increase).

Three stray, unconnected remarks over the course of a seven-week period are "episodic" and therefore will not "meet the threshold of severity or pervasiveness," Gonzalez v. N.Y. State Div. of Human Rights, 2011 WL 4582428, at *4 (S.D.N.Y. Sept. 29, 2011) (quoting Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)). To be sure, "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," Richardson, 180 F.3d at 439, and "[t]he use of a racist epithet is certainly evidence of racial discrimination," Rayboy-Brauestein, 467 F. Supp. 2d at 360. However, the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate [§ 1981]." Jowers v. Family Dollar Stores, Inc., 2010 WL 3528978, at *4 (S.D.N.Y. Aug. 16, 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (quotation mark omitted). While this Court does not condone the comments that Morrison describes, he has not demonstrated a pattern of hostility actionable under § 1981 and the NYSHRL.

Morrison also draws no factual connection between his race and his supervisor's criticisms. And subjectively attributing a discriminatory motive to these otherwise race-neutral interactions smacks of "mere conjecture" that does not create a material dispute of fact. Hicks,

9

593 F.3d at 166.  Moreover, § 1981 "does not set forth a general civility code for the American workplace."  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Morrison's evidence further does not allow this Court to impute liability to UPS. His supervisor's lone comment is not by itself a cognizable pattern of conduct, and so there is nothing to impute to UPS.  Jowers, 2010 WL 3528978, at *4 (quoting Harris, 510 U.S. at 21) (quotation mark omitted).  As for his white co-worker, Morrison conceded in deposition that the mechanic was not his supervisor and introduced no evidence that his white co-worker had any decision-making role in his employment.  See, e.g., Khan v. Abercrombie & Fitch, Inc., 2003 WL 22149527, at *7 (S.D.N.Y. Sept. 17, 2003) (declining to impose liability where "[employee] played no role in [defendant's] decision to terminate [plaintiff]").

And under either the § 1981 or NYSHRL standard, Morrison cannot show that UPS knew about his co-worker's remarks because he concedes that he did not report them.  His purported complaint about his supervisor contains no reference to any race-based harassment. (Pl.'s 56.1, ¶ 38; Herbert Dep., 24:15–25:8.)  The protestations during his termination meeting that his white co-worker "racially attacked" him and that his firing was biased are irrelevant because UPS had already decided to terminate him.  (Def.'s 56.1, ¶ 65; Pl.'s 56.1, ¶ 65.)  His signed acknowledgement of UPS's anti-discrimination policy also negates any argument that UPS lacked a reporting policy or that the company condoned, encouraged, or approved of this behavior.  UPS cannot fairly be held liable for behavior that it did not and could not possibly know was occurring.

For all of these reasons, UPS's motion for summary judgment on Morrison's § 1981 and NYSHRL claims for hostile work environment is granted.

B. Disparate Treatment

The Second Circuit adopts the familiar McDonnell Douglas framework for disparate treatment claims arising under § 1981 and the NYSHRL. See Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012). The plaintiff must make a prima facie case by demonstrating (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. Ruiz v. City of Rockland, 609 F.3d 486, 491 (2d Cir. 2010).

The plaintiff's burden in setting forth a prima facie case for disparate treatment is "de minimis." Douglas v. Dist. Council 37 Mun. Emps.' Educ. Fund Tr., 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). Accordingly, "[a] trial court must be cautious about granting summary judgment to an employer [in a discrimination case] when . . . intent is at issue." Gamble v. Chertoff, 2006 WL 3794290, at *3 (S.D.N.Y. Dec. 27, 2006) (quoting Gallo v. Prudential Residential Servs., Ltd. P'Ship, 22 F.3d 1219, 1224 (2d Cir. 1994)) (quotation mark omitted). However, this caution does not render the summary judgment standard toothless, as "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). "Conclusory allegations" will not suffice. Schwapp, 118 F.3d at 110.

A plaintiff may establish a prima facie case for disparate treatment in a number of ways. The court may draw an inference of discrimination where the applied-for position was filled by someone outside of plaintiff's protected class. See de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996); Morris v. Ales Grp. USA, Inc., 2007 WL 1893729, at *9 (S.D.N.Y. June 29, 2007). Alternatively, a plaintiff may present evidence

11

that a decision-maker "repeatedly [made] comments that draw a direct link between a plaintiff's membership in a protected class and an adverse employment action." Kaur v. N.Y.C. Health & Hosps. Corp., 688 F. Supp. 2d 317, 333 (S.D.N.Y. 2010). However, the plaintiff must rely on more than "a singular discriminatory comment." Jowers, 2010 WL 3528978, at *3.

If the plaintiff successfully establishes a prima facie case, "the defendant will have the burden of articulating a legitimate, [non-discriminatory] reason for the conduct." Morris v. Temco Serv. Indus., Inc., 2011 WL 6761075, at *3 (S.D.N.Y. Dec. 13, 2011) (quoting Hartley v. Rubio, 785 F. Supp. 2d 165, 181 (S.D.N.Y. 2011)) (quotation marks omitted). "The defendant's burden . . . is light. The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original). If the defendant meets this burden, "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). The plaintiff must show intentional discrimination by a preponderance of the evidence. Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 121 (2d Cir. 1997).

The record establishes that Morrison's replacement was a man of Trinidadian-Indian descent. (Herbert Dep., 34:4–20.) Because his successor fell outside of his protected racial class, Morrison has made a sufficient showing to clear the low prima facie bar. See Jain v. Tokio Marine Mgmt., Inc., 2018 WL 4636842, at *5 (S.D.N.Y. Sept. 27, 2018); Morris, 2007 WL 1893729, at *9.

In turn, UPS has more than adequately articulated a legitimate, non-discriminatory reason for Morrison's termination. UPS argues that Morrison "[lacked] the skills

12

and knowledge he claim[ed] to have as an auto mechanic," and the record evidence fully supports this contention. (Ragnauth Affirm., Ex. A.) Morrison received five weeks of sub-par evaluations, and UPS provides internal memoranda and several witnesses documenting Morrison's poor performance as a probationary employee.

Morrison fails to show by a preponderance of evidence that UPS's reasons were mere pretext. Tellingly, his counter-statement of facts does not dispute that there were repeated complaints about his work. Morrison's statement that "[he] was not told of any complaints by any other employee" and "[he] was not spoken to regarding the [pace] at which he performed repairs" is not evidence that these problems did not exist. Though he occasionally disputes that "there were any [in]efficiencies in his performance," (Pl.'s 56.1, ¶ 38), Morrison's recollection that he was "able to more efficiently and appropriately diagnose issues with UPS'[s] trucks than his Caucasian and East Indian colleagues" is vague and uncorroborated. (Pl.'s 56.1, ¶ 35.)

The remainder of Morrison's evidence misses the mark. His supervisor's lone "byword" remark was at best a "singular discriminatory comment" which, standing alone, would normally not suffice to create a prima facie inference of racial animus. Jowers, 2010 WL 3528978, at *3. It cannot satisfy Morrison's heightened burden to show that UPS's well-documented explanation was pretextual. Morrison's allegations about comparatively worse treatment also do not suffice to create a material issue of fact. Indeed, Morrison undercuts his own allegation by admitting that he was often unable to observe his East Indian colleague's work and "wasn't paying attention to what [he] was doing." (Morrison Dep., 152:24–153:6.) And as explained above, his white co-worker's behavior is irrelevant to UPS's liability because there is no evidence that he had any decision-making authority over Morrison's employment.

Further weakening Morrison's case is the fact that while his supervisor recommended his termination, the final decision fell to the same managers who hired him. This Court addressed an analogous situation in Jowers. In that case, summary judgment was granted when a store manager made a discriminatory remark to the plaintiff, but a senior manager made the termination decision. Jowers, 2010 WL 3528978, at *4. "[W]here the person who made the decision to fire was the same person who made the decision to hire [and was unconnected to the discriminatory remark], it is difficult to impute to [that] person an invidious motivation that would be inconsistent with the decision to hire." Jowers, 2010 WL 3528978, at *4.

Morrison "has failed to adduce [sufficient] evidence to rebut the claim that his termination was based on anything other than [UPS's] claimed reasoning." Jowers, 2010 WL 3528978, at *4. A few uncorroborated stray remarks and Morrison's own perceptions, factually unconnected to his termination and juxtaposed with documented complaints and records of his poor performance, do not "permit a rational finder of fact to infer that the defendant's employment decision was more likely than not" based on discrimination. Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997). For all of these reasons, UPS's motion for summary judgment on Morrison's § 1981 and NYSHRL disparate treatment claims is granted.

## II.  NYCHRL Claims

Compared to § 1981 and the NYSHRL, the NYCHRL is given "an independent liberal construction," Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted), in light of the statute's "uniquely broad and remedial purposes," Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citation omitted). A plaintiff "need only demonstrate by a preponderance of the evidence that [he] has been treated less well than other employees because of [his race] [under the NYCHRL]." Mihalik, 715 F.3d

at 110 (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009)). However, a court may grant summary judgment in "truly insubstantial case[s] in which [the] defendant's behavior [does not] fall within the broad range of conduct that falls between 'severe and pervasive' on the one hand and a 'petty slight or trivial inconvenience' on the other." Hernandez v. Kaisman, 957 N.Y.S.2d 53, 58–59 (N.Y. App. Div. 2012).

As recounted above, Morrison's hostile work environment claim boils down to three discrete incidents—his supervisor's "byword" comment, his co-worker's use of a racial epithet, and the same co-worker's "jungle juice" remark. Here again, his co-worker's behavior is irrelevant. He was not a supervisor and Morrison never reported his remarks to a UPS manager. Liability cannot be imputed to UPS if the company did not know, or could not have known, about a non-supervisory employee's behavior. See, e.g., Hopper v. Banana Republic, LLC, 2008 WL 490613, at *3 (S.D.N.Y. Feb. 25, 2008) (citing N.Y.C. Admin. Code § 8-107(13)).

Morrison's supervisor's critique of the failed presentation and the more favorable treatment of the other trainee were, at best, petty slights with no apparent connection to Morrison's race. See, e.g., Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP, 987 N.Y.S.2d 338, 344 (N.Y. App. Div. 2014) (explaining that isolated remarks or incidents, and being reprimanded for disregarding responsibilities, were no more than petty slights). Thus, Morrison's hostile work environment claim hinges solely upon the alleged "byword" comment. "[E]ven a single comment may be actionable [under the NYCHRL] in the proper context," Mihalik, 715 F.3d at 113 (quoting Williams, 872 N.Y.S.2d at 41 n.30).

Morrison offers no compelling evidence that the remark was offensive in context, let alone a "derogatory term tantamount to the N-word." (Pl.'s Memorandum in Opposition to Def.'s Motion for Summary Judgment, ECF No. 38, at 7.) Morrison's only support, beyond

15

vague references to past experience, is the definition of "byword" in Merriam-Webster's dictionary as "one that personifies a type," "a frequently used word or phrase," or simply "epithet." See Merriam-Webster (online ed.) However, a common sense, contextual reading of this entry suggests only that "byword" is synonymous with the word "epithet," not that the word itself is offensive. Indeed, Morrison cites no authority from case law, history, or commonplace understanding that being called a "byword" is offensive. Moreover, Morrison's supervisor denies either knowledge or use of the term "byword." (Vinci Decl., Ex. 1 ("Ragnauth Dep."), at 48:22–25.) Even under the NYCHRL's more permissive scope, his hostile work environment claim must be dismissed.

        As for his disparate treatment claim, Morrison has not produced evidence demonstrating under either a McDonnell Douglas or "mixed motive" framework that his termination was connected to his race. See Melman v. Montefiore Med. Ctr., 946 N.Y.S.2d 27, 30 (N.Y. App. Div. 2012) (quoting Bennett v. Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 120 (N.Y. App. Div. 2011)). Morrison fails to marshal evidence to rebut UPS's well-demonstrated and legitimate reasons for terminating him. As for any mixed motive, once this Court puts aside the "byword" comment, Morrison's supervisor demonstrated no apparent race-based animus at all. And Morrison offers no evidence of any discriminatory motivation attributable to the managers who made the termination decision. "The standard under the NYCHRL is liberal, but not boundless. . . ." LeBlanc v. United Parcel Serv., 2014 WL 1407706, at *13 (S.D.N.Y. Apr. 11, 2014). Morrison's disparate treatment claim simply cannot withstand summary judgment.

## CONCLUSION

For the foregoing reasons, UPS's motion for summary judgment is granted. The Clerk of the Court is directed to terminate the motion pending at ECF No. 30 and to mark this case as closed.

Dated: January 4, 2019
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.